## Bickel, et al. v. Commissioners of Sewerage of City of Louisville, et al.

(Decided May 15, 1928.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Municipal Corporations.—City could not be enjoined from constructing open storm water outlet into which sewers occasionally overflowed, where facts showed that the proportion of objectionable matter in the open outlet on such overflow would be so small as to be harmless and the construction and operation under the proposed plans had met with the approval of the state board of health.

2. Municipal Corporations.—City of Louisville commissioners of sewerage held to have authority, under act relative to constructing and perfecting system of sewerage, to install open storm water outlet to connect with sewers to prevent sewers becoming inade-. quate in periods of unusual rainfall.

JAS. P. GREGORY and KENDRICK R. LEWIS for appellants.

GROVER G. SALES and WILLIAM T. BASKETT for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE—
Affirming.

Appellants instituted this action and by way of relief sought to enjoin appellees the commissioners of sewerage of Louisville and the city of Louisville from excavating an open sewer, part of a project for sewer extension in course of installation by the city, and turning into it sewage from the city. They predicate their right to the relief sought upon the ground that the proposed open sewer and draining into it sewage will inevitably be a nuisance. Appellants were interested because they owned property near which the proposed sewer will run. The city defended upon the theory that

it is a storm water outlet and not an open sewer which it proposes to construct, and that the drainage through it will possess none of the objectionable qualities alleged in the petition and will not constitute a nuisance. The chancellor adjudged that appellants failed to manifest the right to the relief sought and dismissed their petition. Hence the appeal.

In extending its system of subterranean sewers the city of Louisville has recently so improved large sections of newly added territory, and these new sewers drain to and will be connected with a trunk line known as the Southern Outfall sewer, which empties into the Ohio river. By calculation based upon observations extending over a long period of time, and judging the future by the past, it has been determined that when these new sewers are connected with the Southern Outfall sewer, due to the fact that they carry not only waste water and waste matter from residences and business houses, but also all surface water when it rains, there will be occasions during periods of excessive rainfall that the Southern Outfall sewer will be taxed beyond its capacity. During periods of all ordinary rainfall the Southern Outfall sewer will be ample to drain off both the sewage and the surface water; and the occasions when it will be insufficient, due to unusual rainfall, will not occur more frequently than twice per month on an average. It became necessary for the city and the sewerage commissioners to devise some means of taking care of the excess water during these periods of unusual rainfall. Being limited in the amount of money at their disposal, they are unable now to construct an additional subterranean or covered sewer to the Ohio river. The sanitary engineer employed by the appellees devised the plan, execution of which appellants seek to enjoin, and before the plan was adopted or any steps taken to put it into execution it was submitted to the state board of health for approval, and was approved.

The plan in brief is this: By an ingenious arrangement a spillway is provided in connection with certain of the sewers leading to the Southern Outfall sewer whereby, when during exceptional rainstorms the combination of surface water and sewage has raised the stream in these subterranean sewers to a depth of approximately four feet, three feet and nine inches to be exact, part of the stream will be diverted from the sewers

over a spillway and flow into the proposed open sewer which leads to the Ohio river. According to the testimony of the expert sanitary engineers, who have testified for appellees herein, when at such times there is an overflow from the sewers into the open drain the proportion of objectionable matter in the stream will be so small as to be harmless, especially under the further safeguards provided. Their evidence is that, in addition to the enormous ratio of water to objectionable waste matter composing the sewer content that will be diverted from the subterranean sewers to the open sewer, the latter will also drain several thousand acres of land, the fresh-water drainage from which in these periods of unusual rainfall will also be mixed with and further dilute the stream diverted from the subterranean sewer. It appears that in what is termed "dry sewerage," which is the average content of a city's sewers, consisting of waste water and waste solid matter, without the admixture of surface drainage from rainfall, there is a ratio of 1,000 parts of water to 1 part of solid matter, while as to fecal matter, the most objectionable sewerage content, the proportion is 3,000 parts of water to 1 of fecal matter. The evidence is that with the admixture of the quantity of surface water necessary to raise the streams in the sewers here in question high enough so that any will escape over the spillway, the ratio of solid matter to water will be 1 to 44,000, while the ratio of fecal matter to water will be 1 to 133,000. Appellants live on the Eighteenth Street road where the proposed open sewer will cross it, and the evidence is that by the time anything diverted from the sewers reaches this point the addition of local surface water which has drained into the open sewer will so dilute the stream that the proportion of fecal matter to water will be 1 to 319,200. In addition to this, it is shown for appellees that under the plans for the open sewer its grade or fall will be such that its stream will flow at "critical velocity," explained to mean that the velocity of the water will be such that all solid matter will be kept in suspension as to prevent sedimentation and at the same time such as to prevent scouring or erosion of the bottom or banks of the drain. Consequently, the testimony for appelleees establishes that there will be no sedimentation of the objectionable and dangerous waste matter from the sewers on the banks of the storm water

outlet and pockets or pools will not be formed to stagnate and be offensive and menacing to health.

The evidence goes into detail as to the engineering principles involved, the size of the bed of the stream, the angles of the banks, the grade thereof, or amount of fall per unit the water will have. Statement of these details are not necessary to a determination of the question presented by this appeal. It is sufficient to say that the testimony of the drainage and sanitary experts and engineers, who have testified herein, is to the effect that under the conditions herein described the amount of objectionable waste matter diverted from the city's system of underground sewers will be so small a part of the contents of the stream of water that will flow through the open sewer that it will be harmless. It will be so constructed as to size and plans and grade that none of this small percentage of objectionable waste matter will be permitted to be deposited on its banks and no water impregnated with the small percentage of objectionable waste will be left standing in pockets or pools to stagnate or give off odors or create unhealthy or unsanitary conditions.

Perhaps the best evidence that the proposed storm water outlet will be unobjectionable is the fact that its construction and operation under the plans proposed has met with the approval of our state board of health. If there were reasonable apprehension of danger that this enterprise would likely be a breeder of diseases and a menace to the health of the community, we feel that our state board of health would register the first protest.

Opposed to this convincing evidence from experts on the question to the effect that the proposed open storm water outlet will possess none of the objectionable features imputed to it by appellants in their pleadings as the basis for its abatement as a nuisance, we find the record contains no evidence of probative value. Dr. Willard Rouse Jillson, our state geologist, testified for them, and he of all their witnesses approaches nearest to qualifying as an expert. He appears to have written a phamplet entitled "Pollution of Stream Waters in Kentucky," and appears at least to have given some thought to stream pollution. He, however, does not profess to have made a study of sanitary engineering or the other principles of engineering involved in the matter we have before us, and his evidence, like that of the other witnesses for appellants, when finally analyzed, is that this

open sewer necessarily will be a nuisance because all other open sewers have been. The witnesses for appellants testify with reference to this as if it were an open sewer, in the sense that sewage will at all times be discharged into it. Their testimony is not directed toward what the record establishes the drainage project they seek to enjoin will be, a storm water outlet to relieve the subterranean sewer system when from excessive rainfall they are overtaxed and when from the tremendous preponderance of fresh rainwater the overflow into the open drain will be innocuous.

Many opinions written by this court enjoining municipalities and other corporations and individuals from maintaining established nuisances are cited and relied upon by counsel for appellants. Reference to those opinions will disclose that the evidence in such cases was sufficient to establish that a nuisance existed or inevitably would exist authorizing injunction as a remedy. City of Henderson v. Robinson et al., 152 Ky. 245, 153 S. W. 224, may be cited as fairly representative of the numerous opinions relied upon by appellants. The city in that case was shown to have discharged all its sewage into Canoe creek. In the summer season when this stream was low and its waters stagnant, the continued discharge of the city's sewage into it resulted in conditions constituting a nuisance, and relief was granted against the city. Appellants would have a case here measuring up to the City of Henderson case and the others cited and relied upon by them if the evidence had shown that in the dry seasons of the year the sewage from the city would be discharged into this open sewer, for this would inevitably result in a nuisance. Such evidence would have caused this case to fall within the principles announced in the many cases cited by counsel for appellant. But as we have indicated such is not the case.

If the theory of the experts and engineers does not work out in practice, and if when used this storm water outlet erodes or scours, causing pockets or pools of water to form, and if there is a sufficient amount of objectionable solid waste matter so that with stagnation the pools so formed give off foul odors, become the breeding place of diseases and a menace to the health of the public, it will constitute a public nuisance; and upon a showing of such condition appellants or others showing themselves sufficiently interested may abate such a nuisance by injunction. But, there being no reasonable basis from the

evidence herein for concluding that what the city proposes to do will create a nuisance, we are without authority to forbid the city and its commissioners of sewers from proceeding with the construction of the storm water outlet. (

The principles of law determinative of the questions presented by this appeal have often been considered and written by this court. This case upon its facts falls clearly within the rule announced in Dumesnil v. Dupont, 18 B. Mon. 800, 68 Am. Dec. 750; Pfingst v. Senn, 94 Ky. 556, 23 S. W. 358, 15 Ky. Law Rep. 325, 21 L. R. A. 569; Alexander v. Tebeau, 71 S. W. 427, 24 Ky. Law Rep. 1305; Duncan v. Central Pass. Ry. Co., 85 Ky. 525, 4 S. W. 228, 9 Ky. Law Rep. 92; City of Richmond v. House, 177 Ky. 814, 198 S. W. 218; Emrich v. Marcucilli, 196 Ky. 495, 244 S. W. 865; and Pearson & Son v. Bonnie, 209 Ky. 307, 272 S. W. 375, 43 A. L. R. 1116—in each of which injunction was refused.

Conceding that the commissioners of sewerage have only such powers as are granted by the Legislature, and that the act granting such powers must be strictly construed, without elaborating, this court concludes that the commissioners have authority to install the storm water outlet under the act which authorizes them:

"First, to make all such preliminary investigations and to do all such preliminary work as should, in its judgment, proceed the actual projection, construction and establishment of additions to and making more perfect the system of sewerage. Second, to construct and establish all such local, district, lateral, intercepting, out-fall or other sewers and all such conduits, drains and pumping or other plants, and all such buildings, structures, work, apparatus or agencies, and to lay all such mains and pipes within the said city or in the county in which said city is located, as it may deem expedient for carrying said system of sewerage projected and adopted into full effect. Third, to incorporate with said sewerage extension or otherwise utilized for the purpose of this act, so far as it may deem expedient, any or all public sewers or drains, including storm water sewers, drains and water courses and any and all of their appurtenances, either in their present condition or with such repairs, modifications, or changes as said commission may see fit to make, and to en-

large, extend, or improve, or to condemn, close up, abolish or destroy in its discretion, any or all such existing public sewers, drains or water courses or to alter their functions or to increase their burdens as it may think best.'' (Laws 1920, c. 86, sec. 6.)

The judgment of the chancellor, being in full accord with the conclusions here reached, will therefore be affirmed.

Judgment affirmed.

Whole court sitting, except Judge Dietzman, who took no part in the consideration of the case.